The argument this morning is number 06-5130, Cygnus Corp v. United States. Mr. Kearney? Yes, I want to make sure I have the... I was pronouncing it correct. It's Mr. Kearney, right? Yes, sir. Thank you. Okay, you're representing Cygnus, and you have five minutes reserved? Yes, Your Honor. Okay, go ahead. Thank you, Your Honor. My name is Hillary Kearney. I represent Cygnus Corporation, a small business, female-owned, that does substantially all of its business with the federal government. The case before the Court this morning is a procurement dispute. The appeal comes to you by way of a protest decision whereby the underlying court denied our protest, sustaining, if you will, the agency's action in canceling the solicitation. We submit the case to the Court this morning on the rationale that in order for the agency to cancel a solicitation in a negotiated acquisition, it must have a rational basis. The record before the agency must support that rational basis. In this case, the agency canceled the solicitation for one reason. There's a different level of discretion with respect to a decision like the one we have here, namely cancellation of a solicitation, as opposed to awarding the contract to someone else. In other words, is the agency—do we look at those at all differently? In other words, here we know the procurement was canceled. Would that—we have to determine was there an abuse of discretion here, or was discretion here properly exercised? Would there be a different level of scrutiny if you were in here saying, well, I computed with Company X and the agency awarded the contract to Company X. It shouldn't have done that. In other words— I understand your question, Your Honor. Yes, I do. I hope I wasn't too unclear. I know. I understood your question. We submit, Your Honor, as we argued to the Court below, that there's a higher standard that has to kick in relative to the cancellation decision. Higher standard? Higher standard. The reason for that is— You mean to say the agency has less discretion to cancel procurement? That's our position, Your Honor. The reason it has less discretion, unlike the scenario that you've outlined, where the decision would have been made to award to someone else the competitor, presumably under the same solicitation. Under that scenario, the agency has to have a rational basis. When the agency goes forward and cancels a solicitation so that it can award the requirement to other offerors that did not compete under that particular solicitation, it's our position that the agency has to have a higher standard. It's got to have a good reason. Well, now, let me see. What is the status now? I mean, the procurement was canceled. I know that the agency extended your contract for a while, but I assume that extension is over now, correct? That's correct, Your Honor. That's my understanding. Have there been awards made—and I realize I'm going outside the record that made these before us—but just as a procedural matter? Your Honor, I do not know what the agency has done relative to the ongoing EHRQ requirements, whether they've placed orders with other offerors under the BPAs or placed orders under other contracts. I don't have that information. It's not in the record. I do know that the extension to my client expired some time ago and that during the pendency of the litigation, the agency voluntarily agreed to resolve the motion for injunctive relief by refraining from making any orders or placing orders with any of the BPA holders. That was only while it was pending in the Court of Federal Claims. Right, up through June of 2006. Whether or not it continued then, I do not know. June of 2006, I guess. That's correct, Your Honor. So in this instance, what we have is a solicitation that went all the way to offers, multiple offers by way of revision, and in the eleventh hour before the contracting officer was set to make the award decision, canceled the procurement for a single rationale. That rationale had two underlying reasons. One, the agency could save money by awarding the requirements to others under the BPAs, and two, the agency could meet all of its requirements under those BPAs. Our position below and here today is that, A, there was no basis in the record to indicate that the agency would save any funds, money, what have you, by ordering under BPAs, and the lower court agreed with us on that. The lower court determined there was no evidence in the record, administrative record, to substantiate a conclusion of cost savings. Well, the government doesn't challenge the ruling of the Court of Federal Claims on the first point. That's my understanding. But let me ask you, there was significant overlap here between the two procurements, correct? I mean, they're clearly, you would agree there are certain things that are covered in both, correct? I would agree there's commonality of requirements. To an extent. To an extent. The questions, one of them, agreed. Well, supposing they never ordered under the, what are they, the BPAs? Yes, Your Honor. Supposing they never ordered under the BPAs except where there was commonality? And that proves the very point we're trying to make before the Court today. The correct approach from the agency would have been not to cancel the solicitation, but to proceed with the order, and to order under the awarded contract only those requirements that they could not obtain under the BPAs. That's what the case law stands for. Relative to Federal Supply Schedule contracts, by regulation, the agency, a buying agency such as AHRQ, is prohibited from ordering under a BPA or a Federal Supply Schedule contract any requirement that is not explicitly identified in the Federal Supply Schedule contract. And in this instance, if the Court accepts the view from the government, and we do not contest that view, that there is some degree of overlap, then the Court must also accept our position that there are other areas that do not overlap. And with respect to the areas that do not overlap, that the agency is precluded from ordering any of those services, and I would identify for the Court three in particular. You're saying what they should have done is left your procurement in place and ordered from you things that didn't overlap. Well, ordered from the awardee. Left the solicitation intact, proceed to an award, and if that's my client as the awardee, then procure from my client those services that do not overlap with the Federal Supply Schedule offer orders. And if the agency had done that, we wouldn't be here today or at the lower court protesting about it. But with respect to the overlapping elements of the award, would it be appropriate in that setting for the government to say, well, yes, we have given you this award for these various services, but we're going to use the BPAs for, let's say, 80% of the services, those that the BPA is qualified and is on record for having available. But we're going to use you for the ones that are outside. Is that appropriate under procurement law? That's not been appropriate, Your Honor, and that happens all the time. It is not uncommon for the agency to have multiple award vehicles out there whereby on a requirements contract or an IDIQ-type contract, which this would have been, indefinite quantity- I'm not as adept at the acronyms as you are. I will explain. IDIQ. IDIQ, indefinite delivery, indefinite quantity, which means that as and when the agency has a need, it will order from you. If the agency has no need, it may not order anything other than a minimum quantity. Suppose it has need, but it elects to order from someone else. IDIQ. That's perfectly fine. The agency is not required to order all of its needs from you under an IDIQ contract. If it were a requirements contract, which this solicitation was not, the agency would be locked into ordering from you whatever its needs are for those services. But let me come back to a point I started to make a moment ago. There are three specific areas that do not overlap. One is in the area of health care research, a substantive area, a substantive requirement for which under the FSS contracts you will find no coverage. Two, the preparation of reports, health care-related research reports, independent, and I stress that word, independent of any event. Bear in mind the FSS contracts were specifically awarded to acquire event management services, be it for technical conferences or what have you. There is no provision, no coverage under the FSS contract for the provision or preparation of research studies for reports. That differs from the AHRQ solicitation, whereby up to 40 such reports over the life of the contract could have been ordered by the government. The third area, and this is most notable, it's an area that was not addressed by the court in its decision, concerned personnel. There are six categories of personnel identified in the solicitation. The top four categories of personnel require specific health care-related expertise and education. Only when you get down to categories five and six do you get into the realm of dedicated event management services expertise. When you look to the FSS schedules, you will see that the positions focus primarily on event management services capabilities and do not speak to the kinds of expertise, the seasoning, the years of experience, if you will, in the health care field that are required under AHRQ. I'm not sure how the personnel seems to me to be a different element from the other two, in that what you're talking about in effect, is it not, is the quality of the product that is represented by the higher level of the personnel that you're offering. I take it that's the gist of your argument, as compared to the quality of a similar product that would be made available through the BPA. Is that a fair statement of what your argument is? No, Your Honor. I would tweak it just a little bit. Tweak away. It does not so much go to the quality of a product, recognize that this is a services type contract. It's a body contract. I understand that. Okay. So that having been said, it goes to the capabilities, the expertise of the individuals that are providing the hours of service in the area of health care, for example. But presumably you're going to get better service from higher rated people. And that, Your Honor, thank you, that is a fundamental point that was overlooked by the court. By higher rated people carries with it higher compensation. And when you look to the FSS schedules in the areas of compensation, the hourly rates there are fractional in comparison to the hourly rates that have to be paid to someone with higher skill sets. So we're not really dealing with a set of requirements under AHRQ solicitation that are apples and FSS requirements that are apples. They're apples and oranges. And we argue this point at length before the lower court. The one point that the lower court also missed in the area of the requirements analysis is that that analysis was undocumented. And there is no evidence in the record that the agency in reaching its conclusion, quote, unquote, that all of our requirements can be met under the BPAs, in reaching that conclusion, there is no analysis of the reams of data contained in the administrative record. There is no indication of exactly how the agency came to conclude that. And where there is no evidence as to how the agency concluded it, the lower court cannot substitute its judgment and fill in the blanks. In this case, that's exactly what the court did. The court looked at the pivotal communication internally. Joint appendix, page 155, was an email from the supervisor in the contracting shop. And in that email, she says, we can save money and we can meet all of our requirements. It's a very brief email, but the entirety of the government's case rises and falls in that email. It is not up to the court to infuse its judgment and translate that email by filling in blanks that the court perceives may have existed there. Mr. Kennedy, you are now into your rebuttal. You've had some questions. We'll extend your full rebuttal. Thank you, Your Honor. We'll extend the rest of your full rebuttal time. Okay. Thank you. We'll hear from the government. Ms. Hogan? Thank you, Your Honor. May it please the court. I'd like to first address the first issue that you raised with opposing counsel, which is the level of discretion that the agency enjoys in a cancellation decision. And I would, of course, posit the opposite of what Mr. Kerney posited, which is that the agency has an extremely deferential amount of discretion to decide how and when is best to procure its needs. And you can look at some of the cases, the pre-1996 cases, such as American General Leasing and some of those other cases that we cited in our briefs, where the court found that the agency reserves the right not to make any award at all. And, in fact, the agency stated that in their solicitation two times, at page 95 and page 108 in the district of record. The agency said, we are reserving the right not to make any award at all, to make multiple awards, or to make one award. We reserve the right if we're not happy or something changes not to make any award at all. So if that means anything, it must mean that the agency enjoys a great amount of discretion to decide to cancel the procurement. If another contractual vehicle that's already been put into place that releases them from the administration of contracts, and which provides similar services, comes around and they're strongly encouraged by their administration to use those services. Do you think, Ms. Hogan, it would be enough if all you had here was the policy directive that came down from the management of the agency? In other words, here, you had two asserted reasons. One, financial cost savings, and two, you could acquire the same services. Now, the court struck down one, and you're relying on the similarity of the services. But assume all you had was the direction that came down from management, saying, as a policy matter, we want to go the BPA route as opposed to specific procurements. Would that be enough to support cancellation of the procurement without any other supporting rationale? I think in this situation, that would be. And I think if all you had was the contracting officer and the head of contracting reviewing the statement that OSAM had made and the information that they had been given about the strategic sourcing initiative, that that would be sufficient. It certainly would be rational for the agency to accept the word of the administration that these provide similar services, and that they're going to present a cost savings. Both things were stated to them. I don't think there's any reason to believe that they couldn't assume and take that as a word. Now, we do have in this case, of course, the AHRQ actually confirming that for themselves by the financial situation, which, again, we're not raising that on appeal, but also the similarity of services. You can look at the statement of work for the cancel RFP. You can look at the statement of work for the BPAs. You can see that there's a clear overlap and that the head of contracting— But you're not contending with this 100%. You're not contesting Mr. Kennedy's argument that there are some services that were within the scope of the solicitation that are not providable pursuant to the BPAs. Your Honor, I think that's a difficult question to answer because there's been no task orders placed by AHRQ. During the time of record evidence, there were no task orders actually placed by AHRQ to procure the services. So we don't know what in the future they might require or they may not. But even assuming that— Well, assuming that there were—I mean, one of the tasks that was within the scope of the solicitation in which this was prepared to provide, I suppose, is health care research, another one, health care research, These were things, I take it, and certainly in Mr. Kennedy's position, I didn't understand you to be contesting this, that would not be providable under the BPAs. Again, Your Honor, I think some of those things may be providable. I think some of those things may not be providable. We would have to have an actual task order to be able to see whether that was a secret violation or not. But assuming that they were not— Well, suppose your task order—I mean, I'm having a hard time seeing why this isn't a fairly clear-cut question to answer. Because assuming the task order is, we don't have an event, but we would like some research done on the following subject. This is one of 40 subjects that we want investigated. And then you go looking in the BPAs. Are you allowed to go to the BPA system for that, given the structure that's in place? I think it would be difficult, Your Honor, given that situation, yes. So, we can say— No, basically. No, basically, for that very small percentage of things that Mr. Kerrigan's raised. Now, if you're talking about research that may be related to an event— No, I'm not. I'm not saying you ought to be doing that. I think we would have a harder time saying that that would be within the scope of those BPAs, which is not to say that the agency could not later procure those services in an open competition later and that CYGNSS couldn't compete for that if the agency had a need for that later. Now, do you also—would you agree, Mr. Kerrigan, that one option that would have been open to you and it would have been lawful for you to proceed pursuant to this option would have been to continue with the procurement with all of the services that CYGNSS was offering and then to have gone to CYGNSS only for those services that were clearly outside the scope of the BPAs and for all of the services that were procurable, leaving CYGNSS with potentially either no work or very little work? Would that have been lawful? Your Honor, I'm not aware of any specific FAR provision that would preclude that. I will say that it was probably the bad procurement practice to issue a procurement to have a contract for services that you know you're not going to order. I mean, it would seem to me that somebody in CYGNSS's position would be pretty unhappy as to having spent a lot of resources on responding to the solicitation and ends up basically being gutted. Correct, Your Honor. I'm not familiar enough with the contracting world to know whether that's something that happens every day or whether that's something that would be a source of angry letters to the head of the agency. Right. Well, the IVIQ type of contract would be perfectly acceptable. Again, if the agency knows it's not going to use it for, I'll say, 75 percent, which is an estimate, of the services, then it wouldn't really be appropriate to do that. But it brings a larger question, which is… Mr. Carney is saying he wouldn't have been thrilled with that outcome. Maybe that's an overstatement. But it's certainly a suggestion to us that that wouldn't have been a lawful way to proceed. And again, Your Honor, I don't have anything specific to say that it would be unlawful for the agency to do that. What I would say is that, again, the test here is not what CYGNSS would like the government to do or even what the trial court thought would be the better decision to do. It's whether the agency's decision to cancel was rational or wholly without reason. And CYGNSS has not pointed to any evidence that it was wholly without reason. I'd also point out that… You would agree, Judge, that there is – that the government cannot just go out and cancel the procurement. There has to be some kind of rational basis for the cancellation. It's subject to the same rational basis test that any other procurement decision would be, yes. What is the consequence? Another question that I'm afraid shows my ignorance of the procurement law, but help me out here. What would be the consequence of the government having the BPA structure in place but then going to the providers, the service provider under the BPA for services that are not included? Would that be protestable by a potential bidder like CYGNSS? That raises a good point, Your Honor. If an agency is procuring non-Federal Supply Schedule contract services from a Federal Supply Schedule contract holder, and their claim is that it would be either an out-of-scope modification or a CECA violation, that is protestable. The question is, does CYGNSS have standing to raise that issue? And we would state that CYGNSS does not have standing to raise that issue because CYGNSS did not participate in that initial procurement because it is not a Federal Supply Schedule holder. But it wouldn't be, I mean, the problem would not be with the Federal Supply System participation. It would be with the fact that the government has gone into an area that isn't covered by definition by the Federal Supply. I mean, take a silly example. I mean, you have somebody, Staples, is under the Federal Supply ongoing contract to provide pencils and erasers. And the Department of Defense decides that Staples, they'll go to Staples to provide an armored personnel carrier. And suddenly, the general dynamics are coming and saying, what are you doing? That isn't within the scope of, what can general dynamics, surely general dynamics would not be told, ah, you didn't bid on pencils and erasers, and therefore you don't have standing, right? In that situation, my understanding of the improper modification case law is that general dynamics would have had to show that they would have participated in that procurement had it been advertised. Okay, well then, but Simmons can show that, surely, with respect to the particular activities that are within its bid but are arguably outside of the BPA, it's supposed to be BPA, right? I would argue that if the argument is that the, well, yes, yes. Okay. Thank you. Briefly, I would just address the personnel issue that Simmons raised. We did deal with that particular aspect in more detail in our motion for summary judgment below. But I think your Honor is correct that the issue here is really one of the services that the agency is requiring and how the quality or how they determine the kind of personnel that they need is really left up to the agency. If Your Honor has any further questions, I will respectfully request that this court defer a trial court's decision. Thank you. Thank you, Ms. Hiller. Mr. Caron? You have your rebuttal. Thank you, Your Honor. I'll try and get the points that the bench raised in the order in which it raised it. Question. Is the policy directive coming from HHS in and of itself sufficient to allow the agency, in this instance, to cancel the AHRQ solicitation? Answer. Absolutely not. Why? Because in the policy directive issued by the agency, it encourages, it urges buying activities such as AHRQ to use these BPAs for the acquisition of commercial-like and commodity-type services. That policy directive informs agency buyers that there is a category of, quote-unquote, appropriate procurements whereby it may make sense for the agency to use a dedicated acquisition vehicle such as a solicitation, such as was done here. But in order to get at whether or not the policy directive in and of itself would suffice in this acquisition, the contracting officer has to make a determination, has to figure out, is this AHRQ requirement the sort of requirement that we ought to continue with our own acquisition, or does it truly represent commercial-like and commodity-type services? Of course, the record below, the administrative record for the agency as well as for the court, there is no evidence to indicate that the contracting officer paid any attention to that qualifying language. That's point number one. Point number two, and we cite this in our brief at page 39, it's the Newport News v. Garrett case, the court of appeals case for this circuit. The policy directive, if it violates law, either in its content or in its application, then that directive does not constitute a rational basis for procurement decisions. In this case, we're not challenging the validity of the underlying policy, but we are challenging the manner in which that policy was applied by the procurement office. In this case, the contracting officer simply looked at some language and said, we've got to use these BPAs, and that's what we're going to do, and cooked up a rationale and said, well, save some money and we can meet all the requirements. But the contracting officer never assessed whether or not this was an appropriate procurement for using the BPAs, never did the cost analysis. And importantly, if you accept the lower course rationale that there was no cost analysis conducted, you must accept the follow-on conclusion, which is there was no requirements analysis conducted. And the evidence that there was no requirements analysis conducted is the absence in the administrative record of any comparison of labor, labor positions, qualifications, caliber of services, kinds of services, and so forth. There was, if you will, a presumption that there's this overlap. That's not enough. If we were to accept your argument there, though, wouldn't we then have to say that the lower court abused its discretion? Yes, you would. And relative to what is the correct standard for a procurement decision, I would accept that it would be based on a rational basis test for purposes of this appeal. I would concede that point. But I would submit to the court having a rational basis, even if it's a relatively low standard, is not the same as no standard. A rational basis requires something. It must involve a consideration of all relevant factors, and it must be documented in some form so that the appellate court or the lower court can assess the validity of the underlying rationale. And in this case, we have no documents, contemporaneous documents, showing a cost analysis. We have no contemporaneous documents showing a requirements analysis. The underlying rationale fails whether you accept the premise that both cost savings and technical requirements must be realized in order for a cancellation decision to survive, or if you accept the court's more lenient view, which is, eh, either or. It doesn't really matter. If the cost savings is illusory, it's okay then. You can still cancel if there's a technical basis for it. And we submit that by the contracting officer's own words, it was cost and requirements. By the record before the court, there was no cost analysis. Therefore, the rationale fails. By the record before the court, even under an either or standard, there was no technical requirements analysis. And that problem fails. A couple of additional points. I'll be brief, Your Honor. The consequence of using the BPA to acquire non-FSS services raises a protestable issue. The entities that can protest that decision are people or companies that are interested in the added features, not simply the staples and pencils. No, which would be general dynamics in my case. Yes. In this case. Yes. And is it necessary that general dynamics would have bid on the staples contract? Absolutely not. No, that makes sense. Okay. The same is true of Signus. Why should it? Exactly. The same is true of Signus. It's not necessary that we would have participated in the federal supply schedule program. I'm not sure. But even looking ahead, I would submit Signus has since remedied that and now has a federal supply schedule. Well, okay. But doesn't that mean that as soon as the agency goes outside the BPA, that Signus can protest that? At that point in time. However, we do not need to have a task order issued today because the agency's rationale for cancellation is based not on the placement of the order, but on the intention to place the order. Their rationale is driven by its intent. And under the case law we cited in our brief, the absence of a current task order now is irrelevant. What is relevant is the rationale the agency put forth for cancellation. They said we can do this and we can do that. Therefore, that's the only reason we need to cancel. The test here today is whether or not their intended rationale is legal. Not whether or not they've actually issued a procurement order. And bear in mind that up to now the agency has refrained from doing so as a means of overcoming or resolving a motion for injunctive relief. Unless there are further questions, I'm going to be on my time. Thank you. Thank you, Your Honor. I appreciate your attention. Thank you. Case is submitted. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m. Thank you.